**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br>**CAZ L. CRAFFY a/k/a CARZ LEVINSKI CRAFFEY,**<br>**Defendant.** | **Civil Action No. 23-CV-3639**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), 100 Pearl St., Suite 20-100, New York, New York, 10004, files this complaint against Caz L. Craffy, also known as Carz Levinski Craffey ("Craffy"), 4 Country Club Lane, Colts Neck, New Jersey, 07722, and alleges as follows:

## SUMMARY OF THE ACTION

1. Caz Craffy abused a position of trust to violate the antifraud provisions and Regulation Best Interest of the federal securities laws.

2. From November 2017 through January 2023, Craffy worked full-time as a U.S. Army Financial Counselor, tasked in part with helping Gold Star families who had received survivor and insurance payments of as much as $500,000 because a family member had died while on active duty. Concurrently, Craffy also worked full-time as a broker for private brokerage firms, but failed to disclose these positions to the Army as required by law and ethics rules. Craffy then defrauded grieving families to enrich himself.

3. Craffy exploited the heartache and relative lack of financial sophistication of at least 29 Gold Star family customers to direct that they transfer funds to brokerage accounts under his control. Craffy subsequently engaged in unauthorized trading in these and two other customers' accounts, which led to large commission payments for him and often to large losses for his customers. None of these accounts was discretionary, meaning that Craffy could only conduct trades with his customers' explicit approval. Yet Craffy repeatedly traded without his customers' permission and hid his trades from them, including by directing that customers not look at their account statements. Craffy also misappropriated $50,000 from a thirteen-year-old customer's Individual Retirement Account, which he caused to be lent to him personally.

4. Craffy further exposed several of his customers to large losses by failing to comply with the Care Obligation imposed on all brokers by Regulation Best Interest. Craffy knew that his customers' primary investment goals were often to preserve their funds, including for short-term uses like paying for educational expenses or their retirement. But Craffy engaged in excessive trading in at least four of his customers' securities accounts, depleting their funds through fees and commissions that largely benefited him personally. Craffy also engaged in high-risk trading that was not in his customers' best interest because it did not match the customers' risk profiles and investment objectives and made their assets extremely vulnerable to risks of loss through concentration and lack of diversification.

5. As a result of these violations, Craffy's customers suffered approximately $1.79 million in realized losses and $1.8 million in unrealized losses. About $1.64 million of the realized losses were fees or commissions, most of which went to Craffy.

## VIOLATIONS

6. By virtue of the foregoing conduct and as alleged further herein, Craffy has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5 and 15*l*-1(a)(1) thereunder [17 C.F.R. §§ 240.10b-5 & 240.15*l*-1(a)(1)].

7. Unless Craffy is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

9. The Commission seeks a final judgment: (a) permanently enjoining Craffy from violating the federal securities laws and rules this Complaint alleges he has violated, pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Sections 21(d)(1) and (d)(5) [15 U.S.C. §§ 78u(d)(1) and (d)(5)]; (b) ordering Craffy to disgorge all ill-gotten gains he received as a result of the

violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Craffy to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

11. Defendant Craffy, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendant Craffy may be found in, is an inhabitant of, and transacts business in the District of New Jersey, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including Craffy's meeting and communicating with customers, hiding his activities from his customers, failing to exercise his obligations under Regulation Best Interest, and receiving commission payments derived from his unauthorized trading.

## DEFENDANT

13. **Craffy**, age 40, resides in Colts Neck, New Jersey. Craffy has been a member of the United States Army Reserves since at least 2003 and is currently a Major. From November 2017 until January 2023, Craffy was employed full-time as a Financial Counselor at the U.S. Army's Fort Dix Survivor Outreach Services program. Craffy has been associated with five broker-dealer firms from 2011 until November 2022, and has held Series 7 and 63 securities licenses. On December 8, 2022, the Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization that oversees U.S. broker-dealers, barred Craffy from associating with any FINRA member in all capacities, including as a broker, because he failed to provide information and testimony as required under FINRA rules.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

14. **Brokerage Firm A** is a Virginia corporation with its principal place of business in Boca Raton, Florida. Brokerage Firm A registered with the SEC as a broker-dealer in July 2000. Craffy was associated with Brokerage Firm A as a full-time registered representative from May 2017 through March 2021.

15. **Brokerage Firm B** is a New Jersey limited liability company with its principal place of business in Point Pleasant Beach, New Jersey. Brokerage Firm B registered with the SEC as a broker-dealer in July 2018. Craffy was associated with Brokerage Firm B as a registered representative from April 2021 through November 2022. Brokerage Firm B terminated Craffy in mid-November 2022. Brokerage Firm B then took over the servicing of his customers' accounts.

## FACTS

### I. GOLD STAR FAMILIES AND CUSTOMERS OF PRIVATE BROKERAGE FIRMS TRUSTED CRAFFY.

16. Gold Star families are the survivors and loved ones of U.S. military service members who died during active duty service, regardless of cause. Certain Gold Star family members receive survivor benefits, including death benefits and insurance payments, as a result of their loved one's death.

17. Because Gold Star families have experienced traumatic losses and may be relatively financially unsophisticated, the U.S military provides them with Financial Counselors to furnish guidance and assistance concerning their survivor benefits.

18. Craffy became a full-time Financial Counselor with the U.S. Army's Fort Dix Survivor Outreach Services program in November 2017. In this role, Craffy was responsible for providing general financial education, counseling, and support for individuals associated with the U.S. Army, including Gold Star families.

19. Craffy was required by law to disclose outside assets, income, and arrangements to the U.S. Army. Craffy also at times acknowledged that as a Financial Counselor he was a "fiduciary" who was "obligated and bound to act in the best interest of" his customers.

20. At the same time he served the U.S. Army full-time as a Financial Counselor, Craffy also worked full-time for private brokerage firms. Craffy first was associated with Brokerage Firm A as a broker (registered representative) from May 2017 through March 2021, and then was associated with Brokerage Firm B as a

broker (registered representative) from April 2021 through November 2022.

21. As a broker, Craffy received commissions from trades he placed for his customers who held accounts at Brokerage Firm A and Brokerage Firm B.

22. Craffy caused at least 29 Gold Star family members he met through his Financial Counselor position to open investment accounts in which trading would personally benefit him at Brokerage Firm A and Brokerage Firm B.

23. The Gold Star family members placed their trust in Craffy in part because they were introduced to him through the U.S. military, and certain of them believed that he would invest their funds in connection with a military-sponsored program.

24. In an effort to hide his misconduct with the Gold Star families, Craffy failed to disclose to the Army his positions with Brokerage Firm A and Brokerage Firm B and the income he received from his work as a broker. He did this despite being required by law to disclose outside assets, income, and arrangements to the U.S. Army.

25. As a broker, Craffy also had additional obligations—such as those imposed by Regulation Best Interest—toward his customers, including the 29 Gold Star families and two other customers with military ties.

## II. CRAFFY FRAUDULENTLY MADE UNAUTHORIZED TRADES IN HIS CUSTOMERS' ACCOUNTS AND HID THESE TRADES FROM HIS CUSTOMERS AND OTHERS.

### A. Craffy Deceived Customers into Opening Brokerage Accounts

26. From approximately May 2018 to November 2022, Craffy instructed at least 31 customers, all of whom had military ties and 29 of whom were Gold Star

family members, to open accounts with him at either Brokerage Firm A or Brokerage Firm B.

27. Many of Craffy's customers were comparatively financially unsophisticated. Often, they had only recently come into large amounts of money through the death of a loved one who had served in the U.S. military.

28. Craffy knew that these customers were grieving and often unfamiliar with stocks and investing.

29. Craffy exploited his customers' trust by recommending that they invest the survivor and insurance benefits they received, often totaling about $500,000, with him personally, sometimes by falsely stating or misleadingly implying that they were required to do so to take advantage of certain benefits.

### B. Craffy Executed Over 1,000 Unauthorized Trades in the Accounts of 31 Customers

30. Both Brokerage Firm A and Brokerage Firm B prohibited Craffy from operating discretionary accounts.

31. In addition, Craffy's customers never gave him written discretionary authority to conduct transactions in their accounts without prior authorization.

32. As a result, Craffy was not permitted to conduct trades in his customers' accounts at either Brokerage Firm A or Brokerage Firm B without explicit authorization from the customers to make specific trades. Any trades Craffy did make without his customers' explicit permission were thus unauthorized.

33. In spite of this prohibition, Craffy purchased and sold securities—

including certain highly-concentrated[1] and thus risky investments—without authorization from his customers.

34. Craffy executed over 1,000 unauthorized trades in accounts, many of which were Individual Retirement Accounts ("IRAs"), for at least the 31 customers at Companies A and B listed below:

| Account Holder | Account Number | Broker-Dealer | Date Opened |
|---|---|---|---|
| Customer 1 | ****3228 | Brokerage Firm B | 6/7/2021 |
| | ****2816 | Brokerage Firm B | 8/5/2021 |
| | ****2577 | Brokerage Firm B | 8/5/2021 |
| Customer 2 (child) | ****0486 | Brokerage Firm B | 6/8/2021 |
| Customer 3 (child) | ****5007 | Brokerage Firm B | 6/8/2021 |
| Customer 4 | ****4052 | Brokerage Firm A | 2/14/2020 |
| | ****5687 | Brokerage Firm B | 6/8/2021 |
| Customer 5 | ****4982 | Brokerage Firm A | 2/18/2020 |
| | ****4046 | Brokerage Firm B | 5/11/2021 |
| Customer 6 | ****1068 | Brokerage Firm B | 12/23/2021 |
| Customer 7 | ****5523 | Brokerage Firm A | 10/29/2018 |
| | ****1990 | Brokerage Firm A | 11/12/2018 |
| | ****8442 | Brokerage Firm B | 4/5/2022 |
| | ****0221 | Brokerage Firm B | 6/7/2021 |
| | ****5281 | Brokerage Firm B | 4/5/2022 |
| Customer 8 | ****9785 | Brokerage Firm B | 1/17/2022 |
| Customer 9 | ****5002 | Brokerage Firm B | 1/10/2022 |
| Customer 10 | ****0779 | Brokerage Firm B | 4/30/2021 |
| | ****1926 | Brokerage Firm A | 2/20/2020 |
| Customer 11 | ****7242 | Brokerage Firm B | 6/18/2021 |
| Customer 12 | ****8260 | Brokerage Firm B | 5/11/2021 |
| | ****9030 | Brokerage Firm B | 5/11/2021 |
| | ****7023 | Brokerage Firm A | 2/14/2019 |
| | ****4205 | Brokerage Firm A | 12/23/2020 |
| | ****2555 | Brokerage Firm A | 12/23/2020 |
| Customer 13 | ****9541 | Brokerage Firm B | 5/18/2021 |
| | ****0621 | Brokerage Firm A | 7/11/2018 |
| Customer 14 | ****8006 | Brokerage Firm B | 4/30/2021 |
| | ****0537 | Brokerage Firm A | 12/21/2020 |
| Customer 15 | ****2938 | Brokerage Firm A | 10/14/2020 |
| | ****7001 | Brokerage Firm B | 5/11/2021 |
| Customer 16 | ****6962 | Brokerage Firm B | 5/18/2021 |
| | ****9185 | Brokerage Firm A | 12/17/2019 |
| Customer 17 | ****7568 | Brokerage Firm A | 12/17/2019 |

[1] A portfolio where more than 20% of the value is held in a single stock is generally considered to be overly concentrated, which exposes an investor to significant company-specific risks.

| | | | |
|---|---|---|---|
| | ****8272 | Brokerage Firm B | 5/11/2021 |
| Customers 18 and 19 | ****6496 | Brokerage Firm B | 7/9/2021 |
| Customer 20 | ****5095 | Brokerage Firm B | 5/21/2021 |
| Customer 21 | ****2139 | Brokerage Firm B | 10/22/2021 |
| Customer 22 | ****6104 | Brokerage Firm A | 11/12/2018 |
| | ****8857 | Brokerage Firm B | 2/15/2022 |
| Customers 22 and 23 | ****7361 | Brokerage Firm B | 2/15/2022 |
| Customer 24 | ****6749 | Brokerage Firm A | 12/8/2020 |
| | ****9973 | Brokerage Firm A | 5/21/2021 |
| Customer 25 | ****9607 | Brokerage Firm A | 11/26/2018 |
| | ****4497 | Brokerage Firm B | 4/30/2021 |
| Customer 26 | ****9148 | Brokerage Firm A | 5/16/2018 |
| | ****7838 | Brokerage Firm B | 5/19/2021 |
| Customer 27 | ****8403 | Brokerage Firm A | 7/30/2018 |
| Customer 28 | ****4414 | Brokerage Firm A | 6/4/2019 |
| | ****0506 | Brokerage Firm A | 7/28/2020 |
| | ****6746 | Brokerage Firm B | 8/5/2021 |
| | ****4267 | Brokerage Firm B | 5/19/2021 |
| Customer 29 | ****0813 | Brokerage Firm B | 9/2/2022 |
| Customer 30 | ****1490 | Brokerage Firm B | 5/5/2022 |
| | ****7571 | Brokerage Firm B | 4/5/2022 |
| Customer 31 | ****9873 | Brokerage Firm B | 4/5/2022 |
| | ****4320 | Brokerage Firm B | 4/5/2022 |

35. Craffy knew and recklessly disregarded that his trades in his customers' accounts were unauthorized.

36. Among other things, Craffy knew and recklessly disregarded that Brokerage Firm A's policies prohibited him from exercising discretionary authority over his customers' accounts.

37. For example, Brokerage Firm A required that Craffy sign a "Monthly Heightened Supervision Agreement and Attestation" for January 2021. This document was at least the fourth such agreement that Craffy had been required to sign at Brokerage Firm A. In it, he acknowledged that "I have not exercised any discretionary authority over any of my client's accounts in transaction based brokerage accounts."

38. In fact, Craffy had executed dozens of unauthorized trades in his

customers' accounts at Brokerage Firm A before falsely signing this attestation on February 12, 2021, and he continued to execute unauthorized trades thereafter.

39. Craffy also knew and recklessly disregarded that Brokerage Firm B prohibited discretionary accounts.

40. For example, on December 21, 2021, Craffy signed Brokerage Firm B's annual compliance questionnaire, which included a list of "Prohibited Acts" that representatives like Craffy were "specifically prohibited by firm policy" from performing. In response to the question, "Do you handle any accounts on a discretionary basis?," Craffy marked, "No."

41. In fact, Craffy had executed dozens of unauthorized trades in his customers' accounts at Brokerage Firm B before falsely signing this attestation on December 21, 2021. Craffy then executed hundreds more unauthorized trades in customer accounts after acknowledging that doing so was prohibited.

### C. Craffy Made Material Misstatements and Omitted Material Facts about His Unauthorized Trading and Customer Losses.

42. In connection with his trading for the 31 customers, Craffy made false statements and omitted material facts that would have made statements not misleading, including the fact of his unauthorized trades, to his customers.

43. In fact, Craffy only communicated with the customers infrequently, and then often only on personal subjects.

44. Moreover, many of Craffy's customers were too distraught to deal with their accounts on a regular basis and trusted Craffy to act on their behalf and in their best interest.

45. Some of Craffy's customers eventually began questioning him about the losses in their accounts. In response, Craffy misrepresented and mischaracterized the unauthorized trades he had placed in their accounts.

46. For example, Craffy told customers that the war in Ukraine or the Covid-19 pandemic had caused their account balances to fall, but often failed to disclose that his trading had incurred large fees that contributed to their specific losses.

47. In addition, Craffy hid account information from some customers, including by directing that they not look at account statements.

48. For example, when Customer 11's daughter asked in December 2021 about the value of Customer 11's account, Craffy wrote in a text message: "Hey hey… haven't you been watching the news. Our positions are the same but omicron has taken a bite out of it. Don't have mom look at anything!!!!" When Customer 11's daughter again asked about the account value in April 2022, Craffy replied, "Don't ask! Just let me do the work for a few months!"

49. By the time Craffy was terminated by Brokerage Firm B in November 2022, Customer 11 suffered realized losses of more than $86,000, of which more than $34,000 were commissions that largely went to Craffy.

50. Many of Craffy's customers suffered realized losses while he was their broker. In total, the 31 customers listed above suffered realized losses of approximately $1.79 million, including approximately $1.64 million in fees and commissions. These commissions were largely paid to Craffy personally. In addition

to these realized losses, many customers also faced substantial unrealized losses. After Craffy was terminated by Brokerage Firm B, the accounts of the 31 customers listed above had unrealized losses totaling approximately $1.8 million.

51. The following four examples illustrate in greater detail Craffy's fraudulent unauthorized trading in his customers' accounts.

**1. Craffy made unauthorized trades in Customer 9's Roth IRA account.**

52. Customer 9 was a Gold Star family member whose husband died while he was an active duty service member. Customer 9 became a widow with three children, one of whom was five years away from starting college.

53. Customer 9 met Craffy through his work as an Army Financial Counselor approximately two months after her husband's death.

54. Craffy falsely told Customer 9 that she would have to invest with Craffy in order to take advantage of certain tax benefits.

55. As a result, Customer 9 opened a Roth IRA with Brokerage Firm B at Craffy's direction and funded it with the full $500,000 she had received in survivor benefits and insurance payments.

56. Craffy told Customer 9 that he would make her "a ton of money," up to $10,000 per month, but never explained how he would trade in her account.

57. Customer 9's account was non-discretionary, meaning that Craffy was required to obtain permission from Customer 9 before placing any trades in her account.

58. Customer 9 was not aware that Craffy was supposed to seek her

authorization before placing trades, and Craffy did not seek Customer 9's permission to place trades.

59. All of Craffy's trades in Customer 9's account at Brokerage Firm B were unauthorized.

60. Craffy omitted to disclose material facts, including the fact of his unauthorized trades in Customer 9's account, to Customer 9.

61. While Craffy was managing Customer 9's account, Customer 9 suffered realized losses of about $122,000, of which approximately $73,000 were fees and commissions that were largely paid to Craffy. Customer 9 also suffered approximate unrealized losses of an additional $24,000.

**2. Craffy made unauthorized trades in brokerage accounts belonging to two minors.**

62. Customer 2 and Customer 3 were both adolescents when their father passed away, leaving them each approximately $200,000 in death gratuity and insurance benefits. Because Customer 2 was fourteen years old and Customer 3 was thirteen, their mother and stepfather managed the funds for their benefit.

63. Craffy met Customer 2 and Customer 3's mother and stepfather through his job as an Army Financial Counselor. The mother and stepfather both had limited investment experience and trusted Craffy because of his position with the Army.

64. At Craffy's direction, Customer 2 and Customer 3's mother and stepfather caused $175,000 each of the Customers' $200,000 in benefits to be directed to separate Roth IRA accounts at Brokerage Firm B, with Craffy as the

broker.

65. Neither Customer 2's nor Customer 3's account was discretionary. As such, Craffy was required to obtain authorization before conducting any trades in their accounts.

66. Craffy did not discuss specific trades with Customers 2 and 3, their mother, or their stepfather before placing trades. Craffy did not receive written permission from Customers 2 or 3, their mother, or their stepfather before placing trades.

67. All of Craffy's trades in Customer 2's and Customer 3's accounts at Brokerage Firm B were unauthorized.

68. Craffy omitted to disclose material facts, including the fact of his unauthorized trades in Customer 2's and Customer 3's accounts, to Customer 2, Customer 3, their mother, or their stepfather.

69. Craffy also did not disclose that his frequent trading in Customer 2's and Customer 3's accounts was causing the value of each to decrease substantially, in part through commissions paid to Craffy for each trade. Instead, Craffy told their mother that factors like the war in Ukraine had caused losses.

70. While Craffy was managing Customer 2's account at Brokerage Firm B, Customer 2 suffered realized losses of approximately $76,000, of which about $42,000 was paid in fees and commissions, most of which went to Craffy. Customer 2 also suffered additional approximate unrealized losses of about $28,000.

71. Due to Craffy's unauthorized trades in Customer 3's account, she paid

approximately $61,000 in fees and commissions, most of which went to Craffy.

72. Craffy also misappropriated funds from Customer 3, described in Section III below, which significantly affected her account's balances.

**3. Craffy made unauthorized trades in Customer 29's brokerage account.**

73. Customer 29 was a Gold Star family member whose husband passed away while on active duty.

74. Customer 29 met Craffy shortly thereafter through his work as a Financial Counselor. She believed that paperwork Craffy provided her was connected to a free program provided by the Army to widows.

75. Customer 29 had no prior experience with investing, and she trusted Craffy because he worked for the Army.

76. As a result, Customer 29 opened a Roth IRA account at Brokerage Firm B that Craffy managed, which she funded with $300,000 in death benefits she received following the death of her husband.

77. Customer 29's account was non-discretionary, meaning that Craffy was required to obtain permission from Customer 29 before placing any trades in her account.

78. Craffy did not seek Customer 29's permission to place trades in her account. Customer 29 was unaware of the specific trades Craffy placed in her account.

79. All of Craffy's trades in Customer 29's account at Brokerage Firm B were unauthorized.

80. Craffy omitted to disclose material facts, including the fact of his trades in Customer 29's account, to Customer 29.

81. While Craffy was managing Customer 29's account, Customer 29 paid approximately $16,000 in fees and commissions, most of which went to Craffy, and also suffered unrealized losses of approximately $52,000.

82. In sum, Craffy committed securities fraud by conducting unauthorized trades in 31 customers' brokerage accounts. Craffy knew or recklessly disregarded that the trades were unauthorized, and he made false statements and made material omissions that would have rendered the statement he did make not misleading, concerning these trades, including the facts of the trades themselves.

## III. CRAFFY MISAPPROPRIATED FUNDS FROM A THIRTEEN-YEAR-OLD CUSTOMER'S BROKERAGE ACCOUNT.

83. As described above, Customer 3 was thirteen years old when Craffy managed her Roth IRA account at Brokerage Firm B. Craffy defrauded Customer 3 through a scheme to misappropriate funds from her securities account.

84. Craffy knew and recklessly disregarded that he could not enter into a financial arrangement with or borrow money from customer accounts.

85. For example, on December 21, 2021, Craffy signed Brokerage Firm B's annual compliance questionnaire, in which he confirmed in a section entitled "Prohibited Acts" that he had never borrowed money from a customer.

86. Nevertheless, Craffy persuaded Customer 3's mother to provide him with a personal loan and suggested that he could borrow funds from Customer 3's Roth IRA account. He further told Customer 3's mother that the funds would be

returned to Customer 3's Roth IRA within approximately two months such that Customer 3 would not incur a tax penalty.

87. On or around March 11, 2022, Craffy sold two stocks in Customer 3's Roth IRA account, generating sales proceeds of about $85,000.

88. Craffy then directed Customer 3's mother to withdraw $50,000 from Customer 3's Roth IRA account. Craffy signed the retirement account withdrawal form as the broker on the account. The securities sales that Craffy made on or around March 11, 2022 funded the $50,000 withdrawal from the account for which he had signed.

89. Customer 3's mother used the $50,000 withdrawn from Customer 3's Roth IRA account to fund a $50,000 check that she wrote to Craffy, which Craffy deposited into his personal bank account.

90. Although the word "gift" was written on the check, Craffy told Customer 3's mother that the check was a loan that he was characterizing as a gift for tax purposes.

91. Craffy did not disclose the loan from Customer 3's Roth IRA account to Brokerage Firm B.

92. Craffy did not repay the $50,000 from the purported loan to Customer 3's Roth IRA account. Moreover, the $50,000 was not returned to Customer 3's Roth IRA account within the approximately two-month time period that Craffy had promised when defrauding Customer 3's mother into loaning him the funds from Customer 3's Roth IRA account.

## IV. CRAFFY VIOLATED REGULATION BEST INTEREST'S CARE OBLIGATION BY EXCESSIVELY TRADING AND OVERLY CONCENTRATING HIS RETAIL CUSTOMERS' ACCOUNTS.

### A. Regulation Best Interest Requires Brokers Like Craffy to Exercise Reasonable Diligence, Care, and Skill When Making Recommendations to Customers.

93. Regulation Best Interest, which became effective on June 30, 2020, established a standard of conduct for broker-dealers and associated persons (including registered representatives like Craffy) when they recommend securities transactions or investment strategies involving securities, including account recommendations, to retail customers.

94. The SEC issued an adopting release offering guidance on how the Commission interprets Regulation Best Interest. *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 34-86031, 84 Fed. Reg. 33318 (July 12, 2019) (the "Adopting Release").

95. The Best Interest Obligation requires a broker, dealer, or a natural person associated with a broker or dealer, when making a securities-transaction or investment-strategy recommendation to a retail customer, to act in the best interest of that retail customer at the time the recommendation is made, without placing the financial or other interest of the broker, dealer, or associated person ahead of the interest of the retail customer.

96. Regulation Best Interest defines a retail customer as "a natural person, or the legal representative of such natural person, who: (i) Receives a recommendation of any securities transaction or investment strategy involving

securities from a broker, dealer, or a natural person who is an associated person of a broker or dealer; and (ii) uses the recommendation primarily for personal, family, or household purposes."

97. A registered representative who conducts a trade on behalf of a customer without that customer's explicit authorization implicitly recommends the trades for that customer.

98. The Best Interest Obligation is satisfied only by compliance with four component obligations: (1) the Disclosure Obligation to provide certain prescribed disclosure, before or at the time of the recommendation, about the recommendation and the relationship between the retail customer and the firm, (2) the Care Obligation to exercise reasonable diligence, care, and skill in making the recommendation, (3) the Conflict of Interest Obligation to establish, maintain, and enforce policies and procedures reasonably designed to address conflicts of interest, and (4) the Compliance Obligation to establish, maintain, and enforce policies and procedures reasonably designed to achieve compliance with Regulation BI.

99. The Care Obligation requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to "[h]ave a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation."

100. The Adopting Release states that what is in the best interest of a retail customer depends on the facts and circumstances of the recommendation, including

"matching" the recommended security to the retail customer's investment profile. Where the match between the retail customer profile and the recommendation appears less reasonable, it is more important for the broker to establish that it had a reasonable belief that the recommendation was in the best interest of the retail customer

101. The Adopting Release states that, in addition to matching the recommendation to the customer's suitability profile, a registered representative should also exercise reasonable diligence, care, and skill to consider reasonably available alternatives.

102. The Care Obligation, as noted in the Adopting Release, also requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to "have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile."

103. The Care Obligation applies to a series of recommended transactions, regardless of whether the broker-dealer exercises actual or *de facto* control over a customer's account.

104. Regulation Best Interest's Adopting Release specifies that "a 'series' of recommended transactions is an established term under the federal securities laws and Self-Regulatory Organization rules that is evaluated in concert with existing guideposts, such as turnover rate, cost-to-equity ratio, and use of in-and-out

trading, which have been developed over time and which serve as indicators of excessive trading."

105. Craffy was thus prohibited under Regulation Best Interest from placing his financial or other interests ahead of his retail customers' interests.

**B. Craffy Did Not Meet His Obligations Under Regulation Best Interest.**

106. Craffy made recommendations to at least six retail customers, through the numerous trades he conducted in their accounts, without a reasonable basis to believe these recommendations were in the best interests of his customers. Craffy further failed to exercise reasonable diligence, care, and skill in making these recommendations to his retail customers.

107. Instead, Craffy made many recommendations that placed Craffy's interests ahead of his retail customers.

108. Craffy knew that his Gold Star family customers were not only grieving, but were also facing the loss of a source of income for their family in the years ahead.

109. Further, Craffy knew that these customers were heavily reliant on the death gratuity and life insurance payments they had received. These funds were a significant source of his customers overall assets, and many customers needed to preserve these funds in the near term for purposes such as their impending retirement or to provide for their children.

110. As set forth below, Craffy also knew and recklessly disregarded that the customers' investment profiles did not match the trades he made.

111. Indeed, his customers often wanted and needed to maintain a conservative trading strategy. Frequently, their Gold Star family benefits were these customers' only significant assets.

112. By contrast, Craffy personally benefited from the trades he executed in these customers' accounts, in part because he received commission payments on a per-transaction basis.

113. To enable his risky, high-commission trading strategy, Craffy presented documents to Brokerage Firm A, Brokerage Firm B, and his customers that falsely portrayed their financial positions and investment strategies, examples of which are alleged in more detail in subsections C through G below. Doing so enabled Craffy to execute trades that may otherwise have raised red flags.

114. In many cases, at his direction, Craffy's customers—who were grappling with the recent loss of a loved one and often found the death benefit funds upsetting to deal with—signed the documents Craffy presented to them, trusting that he had filled them out accurately and without noticing the false representations that the documents contained.

115. Given the mismatch between his retail customers' true investment profiles and the trades Craffy made and the positions he took, Craffy did not demonstrate reasonable diligence, care, or skill in determining that these actions were in his customers' best interests.

116. More specifically, Craffy violated Regulation Best Interest in at least two ways described below.

117. First, Craffy excessively traded in at least four retail customers' accounts, which incurred high costs, including commissions that were mostly paid to him, and had a significant impact on the value of his customers' accounts.

118. Generally, a turnover rate[2] above 6 and a cost-to-equity ratio[3] above 20% are recognized as benchmarks for excessive trading.

119. Craffy incurred large fees and commissions through his trading in the accounts of Customers 9, 2, 3, and 29, all of which had indicators of excessive trading. This trading was excessive under Regulation Best Interest because, among other things, it involved approximate turnover rates and cost-to-equity ratios above widely recognized guideposts for excessive trading, as shown below:

| **Account** | **Turnover Rate** | **Cost-to-Equity Ratio** | **Period** | **Total Trades During Period** | **Approximate Commissions and Fees Paid During Period** |
|---|---|---|---|---|---|
| Customer 9 | 7.1794 | 24.40% | 1/18/22 – 10/31/22 | 50 | $72,682.54 |
| Customer 2 | 6.3038 | 24.40% | 7/20/21 – 10/31/22 | 33 | $41,790.87 |
| Customer 3 | 6.2439 | 26.73% | 7/30/21 – 10/31/22 | 41 | $56,114.00 |
| Customer 29 | 10.4968 | 38.63% | 9/13/22 – 10/31/22 | 12 | $16,212.40 |

120. Second, for three retail customers from approximately August 2021 through October 2022, Craffy recommended trades that resulted in their accounts

---

[2] The turnover rate is the measure of the volume of trading that changes the holdings of a portfolio without changing its size.

[3] The cost-to-equity ratio measures the expenses incurred by a given set of trades against the total holdings in an account over a period of time.

being highly concentrated in one or a small number of corporate-issuer stocks. These concentration levels and lack of diversification posed significant risk of loss. Such trades did not match the customers' investment profiles and were not in the best interest of Craffy's customers.

121. The following examples—each involving retail customers—illustrate how Craffy's trading violated Regulation Best Interest through excessive trading, high concentration, or both.

### 1. Craffy Excessively Traded in Customer 9's Brokerage Account and Exposed Her Funds to High Risks through Concentration.

122. As described above, Customer 9 was a widow with three children, the oldest of whom was 13. Customer 9 told Craffy on several occasions that she wanted the money from her husband's survivor benefits to be available for her children when they turned 18.

123. For example, three days before she opened the account at Brokerage Firm B, Customer 9 wrote to Craffy in a text message, "I want to make sure the money is available for the kids…to help through college, maybe even set up a small nest egg for when they finish college, etc." Customer 9 also noted that her oldest child would be going to college in five years.

124. Craffy thus knew that Customer 9's investment profile called for her to preserve her capital for short-term use.

125. Instead, Craffy presented Customer 9 and Brokerage Firm B with documents that falsely described her risk tolerance as "aggressive" and stated that she wanted a "speculative growth" strategy.

126. Craffy used these false statements to ensure that Customer 9's Roth IRA account would provide him maximum flexibility to execute trades that would earn him significant commissions.

127. Craffy then engaged in a series of transactions that excessively traded Customer 9's account and did not match her investment profile, but instead put Craffy's interest ahead of Customer 9's best interest.

128. Specifically, by trading approximately 50 times in less than 10 months, Craffy generated approximately $73,000 in fees and commissions, most of which he personally received. His excessive trading had a cost-to-equity ratio of more than 24% and a turnover rate greater than seven for Customer 9's account.

129. The large fees and commission payments Craffy incurred, the high turnover rate of the account, and the excessive cost-to-equity ratios of his trading demonstrate that Craffy did not have a reasonable basis for his recommendations to Customer 9.

130. Craffy also engaged in a risky investment strategy that concentrated Customer 9's account in a small number of single corporate-issuer stocks.

131. For example, the following table shows how Craffy caused Customer 9's brokerage account to be highly concentrated in certain stocks at the end of various months:

| **Stock Name** | **Month** | **Stock's Approximate Percentage of Total Portfolio Assets at Month-End** |
|---|---|---|
| Stock A | July 2022 | 100.00% |
| Stock A | October 2022 | 78.05% |
| Stock A | September 2022 | 76.97% |
| Stock A | Aug 2022 | 74.13% |

| Stock Name | Month | Stock's Approximate Percentage of Total Portfolio Assets at Month-End |
|---|---|---|
| Stock A | June 2022 | 58.24% |
| Stock B | May 2022 | 52.47% |
| Stock B | March 2022 | 50.53% |
| Stock B | April 2022 | 49.40% |
| Stock B | January 2022 | 47.76% |
| Stock B | February 2022 | 46.44% |
| Stock C | April 2022 | 44.28% |
| Stock C | May 2022 | 42.84% |
| Stock C | March 2022 | 42.42% |
| Stock C | June 2022 | 41.80% |
| Stock D | August 2022 | 25.91% |
| Stock D | September 2022 | 24.00% |
| Stock D | October 2022 | 23.35% |

132. Price volatility in any one of those stocks in each of the above-listed months could have caused significant losses for Customer 9. Craffy's actions thus exposed Customer 9's account to great risks from concentration and lack of diversification, which did not match her investment profile of attempting to preserve funds for short-term use.

133. Craffy's excessive trading in Customer 9's accounts and concentration of her funds in single corporate-issuer stocks was inconsistent with Customer 9's investment profile and objectives. In doing so, Craffy failed to exercise reasonable diligence, care, and skill in making recommendations to Customer 9, failed to have a reasonable basis for his recommendations, and violated Regulation Best Interest.

**2. Craffy Excessively Traded in Customer 2's and Customer 3's Brokerage Accounts.**

134. As described above, Customers 2 and 3 were minor children when their father died in active duty, leaving them each with approximately $200,000 in survivor benefits. Their mother and stepfather opened separate retirement accounts

for them at Craffy's direction and invested $175,000 each of Customer 2's and Customer 3's money. Their mother and stepfather told Craffy that they wanted the funds they had invested with him to be available for Customers 2 and 3 when they turned 18. For Customer 2, that would only take four years; Customer 3 would turn 18 in just five years.

135. Thus, Craffy knew that Customer 2's and Customer 3's investment profile required that they preserve their capital for short-term use.

136. Nevertheless, Craffy caused forms to be submitted to Brokerage Firm B that contained a number of false statements.

137. First, Craffy listed both Customer 2 and Customer 3 as having a net worth of $750,000 and a liquid net worth of $600,000.

138. These figures were wildly inaccurate, as Craffy knew, because Customer 2's and Customer 3's assets each largely consisted of their father's $200,000 death benefits.

139. In addition, Craffy falsely listed Customer 2's and Customer 3's investment habits as "primary debt payment." Neither Customer 2 nor Customer 3 had any significant debt.

140. Craffy further falsely listed Customer 2's and Customer 3's risk tolerance as "aggressive," their investment objectives as "Maximum Growth," and their strategy as "speculative growth." In fact, Craffy knew that each of these statements was false, because Customer 2 and Customer 3's mother and stepfather had explained to Craffy that Customers 2 and 3 would need to save this money for

use in a few years.

141. Craffy used the false statements on Customer 2's and Customer 3's investment documents to ensure that their Roth IRA accounts would provide him maximum flexibility to execute trades that would earn him significant commissions.

142. Craffy then engaged in a series of excessive trades in Customer 2's and Customer 3's accounts that put his interests ahead of their best interest.

143. Specifically, in a period of just over three months, Craffy conducted approximately 33 trades in Customer 2's brokerage account. The turnover rate for this period was greater than 6.3 and the cost-to-equity ratio for the trades was greater than 24%. Craffy's trades generated more than $41,000 in fees and commissions, most of which went to him.

144. Likewise, in a three-month period, Craffy made about 41 trades in Customer 3's brokerage account, resulting in a turnover rate of greater than 6.2 and a cost-to-equity ratio of greater than 26%. These trades cost Customer 3 more than $56,000 in fees and commissions, most of which went to Craffy.

145. Under the well-recognized guideposts of excessive trading—a turnover rate above 6 and a cost-to-equity ratio of 20%—Craffy's trades in Customer 2's and Customer 3's accounts were excessive. There was no reasonable basis for Craffy to conduct these series of trades, and doing so cost Customers 2 and 3 fees and commissions of more than $90,000.

146. The high turnover rates and the excessive cost-to-equity ratios in the accounts show that Craffy failed in his obligations under Regulation Best Interest

to retail Customers 2 and 3. Instead, Craffy caused them to incur large fees and commissions, thereby putting his interest ahead of the best interests of Customer 2 and 3 in violation of Regulation Best Interest.

### 3. Craffy Excessively Traded in Customer 29's Brokerage Account and Exposed Her Funds to High Risks through Concentration.

147. When Customer 29 met Craffy, she was recently widowed with a seven-year-old son and was living with her in-laws until she could get enough money to move out into her own apartment, all of which was known to Craffy. Customer 29 believed that Craffy's services were a free Army program offered to her as a widow, and she had no idea that Craffy was working for a private company unrelated to the Army.

148. Customer 29 told Craffy that she wanted to save the money she was investing to be available for her son's use. Customer 29 had no prior experience with investing and was not comfortable with the risk of losing her entire savings.

149. Craffy knew that Customer 29's investment needs were to preserve her capital and that pursuing risky strategies did not match her investment profile.

150. Nevertheless, Craffy presented Customer 29 and Brokerage Firm B with documents that falsely described Customer 29's risk tolerance as "Maximum Growth" and stated that she wanted a "speculative growth" strategy. Craffy also falsely represented that Customer 29's net worth was $750,000, when in fact, he well knew, it was significantly lower.

151. Craffy used these false statements to ensure that Customer 29's Roth IRA account would provide him flexibility to execute trades that would earn him

significant commissions.

152. Craffy then engaged in a series of transactions that excessively traded Customer 29's accounts and did not match her investment profile.

153. Specifically, in just six weeks, Craffy executed approximately 12 trades that cost Customer 29 about $16,000 in fees and commissions, most of which were paid to him. The trades represented a cost-to-equity ratio of more than 36% and a turnover rate of approximately ten.

154. The large fees and commissions Craffy caused Customer 29 to pay, the high turnover rate of the account, and the excessive cost-to-equity ratios of his trading demonstrate that Craffy did not have a reasonable basis for his recommendations to Customer 29.

155. Instead, Craffy put his personal interests ahead of Customer 29's best interest, causing her to pay fees and commissions of more than $16,000 in less than two months, most of which went to him personally.

156. Craffy also engaged in a risky investment strategy that concentrated Customer 29's account in a small number of single corporate-issuer stocks.

157. For example, in September 2022 Craffy caused almost all of the funds in Customer 29's Roth IRA account to be held in just two stocks.

158. Concentrating almost all of her funds in two stocks placed Customer 29's funds at great risk and did not match Customer 29's investment profile. Indeed, Customer 29's accounts realized losses from the sale of one of these stocks shortly after Craffy was terminated from Brokerage Firm B in November 2022.

159. Given her investment profile, there was no reasonable basis for Craffy to concentrate almost all of Customer 29's funds in just two stocks.

160. Excessively trading in Customer 29's accounts and concentrating her funds in single corporate-issuer stocks exposed Customer 29 to a higher risk of loss and did not match her investment profile. In doing so, Craffy failed to exercise reasonable diligence, care, and skill in making recommendations to Customer 29, failed to have a reasonable basis for his recommendations, and violated Regulation Best Interest.

#### 4. Craffy Exposed Customer 25's Brokerage Account to a High Risk through Concentration.

161. Customer 25 was 73 years old and already retired when she first met Craffy. Most of her net worth derived from death benefits and insurance payments she received after her son died while serving overseas.

162. Customer 25 had no investment experience before receiving these benefits and trusted Craffy because the Army had assigned him to help her.

163. Craffy directed Customer 25 to open an account at Brokerage Firm B.

164. Craffy knew that Customer 25 was retired, had a fixed income, and needed to preserve her capital. Forms that Craffy presented to Brokerage Firm B listed Customer 25's risk tolerance as moderate and her investment goal as "Income and Growth," meaning "I want my investments to produce a steady stream of income and growth without major declines in value."

165. In spite of Customer 25's need, as a retiree, to preserve her capital, Craffy caused her brokerage account to be highly concentrated in a small number of

single corporate-issuer stocks, as set forth below:

| **Stock Name** | **Month** | **Stock's Percentage of Total Portfolio Assets at Month-End** |
|---|---|---|
| Stock D | October 2022 | 107.06%[4] |
| Stock E | September 2022 | 102.63% |
| Stock F | June 2022 | 100.00% |
| Stock E | August 2022 | 100.00% |
| Stock G | May 2022 | 55.74% |
| Stock H | November 2021 | 55.24% |
| Stock H | December 2021 | 52.90% |
| Stock G | April 2022 | 49.99% |
| Stock H | October 2021 | 48.90% |
| Stock H | January 2022 | 42.47% |
| Stock H | March 2022 | 36.64% |
| Stock H | May 2022 | 36.31% |
| Stock H | February 2022 | 33.56% |
| Stock H | April 2022 | 28.83% |
| Stock I | September 2021 | 28.03% |
| Stock I | August 2021 | 26.03% |

166. Price volatility in any one of those stocks in each of the above-listed months could have caused significant losses for Customer 25, depleting her retirement capital. Craffy's actions thus exposed Customer 25's account to great risks. Given her investment profile, there was no reasonable basis for Craffy to concentrate Customer 25's funds as reflected above.

167. Craffy recommended trades that concentrated Customer 25's assets in single corporate-issuer stocks, lacked diversification, and did not match Customer 25's investment profile or objectives. Craffy failed to exercise reasonable diligence, care, and skill in making recommendations to Customer 25, and thus violated

[4] Concentration percentages at month-end in excess of 100% are due to the account also holding a short position in the same stock through an options trade. That resulted in the account having month-end total portfolio assets that were less than the value of the stock held.

Regulation Best Interest.

### 5. Craffy Exposed Customer 8's Brokerage Account to a High Risk through Concentration.

168. Customer 8 lost her husband while he was on active-duty service in the U.S. Army. She met Craffy in his role as Financial Counselor.

169. Craffy directed Customer 8 to open an account at Brokerage Firm B.

170. At Craffy's direction, Customer 8 invested approximately $340,000 of the survivor benefits and insurance payments she received as a result of her husband's death.

171. When she opened the investment account with Craffy, Customer 8 had a six-year-old daughter and was unable to obtain life insurance herself due to a medical condition. Thus, she told Craffy she wanted the funds she invested through him to be available to her daughter should Customer 8 pass away.

172. In spite of this disclosed need, Craffy prepared contradictory forms on Customer 8's behalf. On one, he accurately listed her investment goal as "Conservative Growth . . . I'm willing to accept a lower return to avoid risk of a major decline in the value of my investments." On another form, he falsely stated that her goal was "Maximum Growth: Maximum capital appreciation with higher risk and little to no income." Craffy also falsely listed Customer 8's income on account forms as higher than it actually was.

173. Craffy disregarded Customer 8's true investment profile in making trades in her account. He caused her Roth IRA account to be highly concentrated in a small number of single corporate-issuer stocks, as set forth below:

| Stock Name | Month | Stock's Approximate Percentage of Total Portfolio Assets at Month-End |
|---|---|---|
| Stock D | October 2022 | 106.78% |
| Stock D | September 2022 | 101.93% |
| Stock D | August 2022 | 100.00% |
| Stock J | July 2022 | 100.00% |
| Stock K | June 2022 | 39.39% |
| Stock K | May 2022 | 34.91% |
| Stock K | March 2022 | 34.88% |
| Stock K | February 2022 | 32.70% |
| Stock K | April 2022 | 31.96% |
| Stock L | February 2022 | 28.70% |
| Stock M | March 2022 | 26.94% |
| Stock M | April 2022 | 25.02% |
| Stock L | April 2022 | 24.96% |
| Stock N | June 2022 | 24.88% |
| Stock L | May 2022 | 24.18% |
| Stock L | March 2022 | 22.75% |
| Stock N | May 2022 | 21.40% |

174. Price volatility in any one of those stocks in each of the above-listed months could have caused significant losses for Customer 8. Craffy's actions thus exposed Customer 8's account to great risks. Given her investment profile, there was no reasonable basis for Craffy to concentrate Customer 8's funds as shown above.

175. Craffy recommended trades that concentrated Customer 8's assets in single corporate-issuer stocks, lacked diversification, and did not match Customer 8's investment profile or objectives. Craffy failed to exercise reasonable diligence, care, and skill in making recommendations to Customer 8, and thus violated Regulation Best Interest.

176. Based on the foregoing, Craffy violated Regulation Best Interest by failing to exercise reasonable diligence, care, and skill and to have a reasonable

basis to believe that his recommendations were in the best interest of his retail customers, based on those customers' investment profiles and the potential risks, rewards, and costs associated with Craffy's recommendations.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

177. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 92.

178. Defendant Craffy, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

179. By reason of the foregoing, Defendant Craffy, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

180. The Commission re-alleges and incorporates by reference here the

allegations in paragraphs 1 through 92.

181. Defendant Craffy, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

182. By reason of the foregoing, Defendant Craffy, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Regulation Best Interest's General Obligation**

183. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 25 and 93 through 176.

184. By engaging in the conduct described above, when making recommendations of securities transactions to retail customers, Defendant Craffy failed to act in the best interest of the retail customers by failing to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.

185. Also, by engaging in the conduct described above, Defendant Craffy made recommendations to retail customers without exercising reasonable diligence, care, and skill to have a reasonable basis to believe the recommendations were in the best interests of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.

186. The failure of Defendant Craffy to comply with Regulation Best Interest's Care Obligation constitutes a violation of Regulation Best Interest's General Obligation.

187. By reason of the foregoing, Defendant Craffy violated and, unless enjoined, will again violate Rule 15*l*-1(a)(1) of the Exchange Act [17 C.F.R. § 240.15*l*-1(a)(1)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendant Craffy from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rules 10b-5 and 15*l*-1(a)(1) [17 C.F.R. §§ 240.10b-5 and 240.15*l*-1(a)(1)];

**II.**

Ordering Defendant Craffy to disgorge all ill-gotten gains he received directly

or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Defendant Craffy to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands that this case be tried before a jury.

*/s/ Antonia M. Apps*
ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon Pollock
Hane L. Kim
Hayden M. Brockett
Michael C. Ellis
Bari R. Nadworny
Ariel Atlas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9107 (Brockett)
brocketth@sec.gov

Date: Trenton, New Jersey
July 7, 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br><br>**CAZ L. CRAFFY**<br>**a/k/a CARZ LEVINSKI CRAFFEY**<br><br>**Defendant** | **Civil Action No. 23-CV-3639**<br><br>**JURY TRIAL DEMANDED**<br><br>**DESIGNATION OF AGENT FOR SERVICE** |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action. Therefore, service upon the United States or its authorized designee, Matthew J. Mailloux, Assistant United States Attorney, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102, shall constitute Service upon the Commission for purposes of this action.

Date: July 7, 2023

*/s/ Antonia M. Apps*
ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon Pollock
Hane L. Kim
Hayden M. Brockett
Michael Ellis
Bari R. Nadworny
Ariel Atlas

Attorneys for Plaintiff:
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9107 (Brockett)
brocketth@sec.gov